Clare J. Hoyt, J.
This is a consolidated action involving suits by the plaintiff, Town of Harrison, hereinafter referred to *1021 as the Town, against the defendant, County of Westchester, hereinafter referred to as the County, to have declared subject to taxation by the Town two hangars located within the limits of the Town and owned by the County and erected upon portions of the County’s airport known as the Westchester County Airport.
At the outset, the history, extent, improvements on, use of, and rights of the tenants or licensees of the County’s airport are important. The court permitted testimony to be adduced as to these elements in areas of the airport outside the limits of the Town so that the court might consider the operation as a whole and then determine whether the use of the hangars which the Town seeks to tax is such as to make them taxable.
In or about the year 1942 the County acquired lands adjacent to the Connecticut State line in the Towns of Rye, Harrison and North Castle for an airport and landing field. The County upon acquisition of these lands entered into agreements with the Federal Government providing in substance that the Federal Government would construct the airport for the County and upon the completion of the construction, unless the airport was utilized exclusively for military purposes, it would be operated by the County for the use and benefit of the general public without unjust discrimination and without the grant or exercise of any exclusive right for the use of the airport. In or about the year 1944 the airport was no longer needed by the Government and its operation and control were returned to the County.
In January of 1945 the County granted a concession to the North American Airport Corporation, now known as County Airport Corporation, hereinafter called the Operator, for the operation of the airport under a long-term lease. The agreement provided that the Operator as concessionaire would operate the airport “as a public airport for the benefit of the public and for the benefit of the County of Westchester ”. The Operator was given the privilege of assigning or subletting its rights in the premises to subconcessionaires or subtenants, all of which agreements were subject to the approval of the County. The revenue to the County was fixed by minimum annual payments and percentages of the gross revenue received by the Operator from its contracts with subconcessionaires and percentages on- the revenue from certain sales made and certain services rendered by the subconcessionaires.
The County undertook to maintain taxiways, runways, parking areas, access roads and certain utilities. The contract with the Operator further provided for the erection, at the- Operator’s expense, of certain hangars and other improvements at the *1022 airport. Title to said improvements was to vest in the County at once and possession of the same was to vest in the County upon the termination of the agreement with the Operator subject to the County’s paying the Operator prescribed percentages of the unamortized costs of these improvements. This agreement with the Operator remains in effect, although it has been amended several times. It expires in 1977.
Pursuant to the contract between the County and the Operator, several hangars were erected at the airport between 1946 and 1958.
The Operator built in 1946 Hangar “ B ”, a small metal hangar located within the Town. It is now sublet to Westchester Aeronautical Corporation and it will be more fully discussed hereinafter since its taxable status is one of the issues before the court.
The Administration Building was erected in 1947 by American Airlines and sold to the Operator. It contains the terminal of Mohawk Airlines, the only scheduled air carrier making use of the field, waiting room, baggage rooms and a restaurant. The building is also the base of operations for a helicopter service, both scheduled and chartered, and for another tenant rendering charter flight service. This building is in the Town of Rye.
In the same year, 1947, the Operator built Hangar “A”, also located in the Town of Rye and occupied by General Precision Laboratories which tests and installs aircraft electronic equipment and by Northeast Weather Service which makes available weather information. A portion is devoted to the maintenance of navigational aids provided by the Federal Aviation Authority.
Hangar “ C ”, also located in the Town of Rye, was likewise built in 1947 and is sublet by the Operator to International Aviation Industries which engages in charter flights, the maintenance and storage of aircraft, and the sale of aircraft and aircraft instruments.
- In 1953 Hangar “D” was erected by the Operator at an approximate cost of $2,000,000. This large three-bay hangar is located in both the Towns of Harrison and Rye and is occupied by several tenants. The taxability of that portion of the hangar in the Town of Harrison is one of the issues before this court. The nature of the tenancies and the use of this hangar, will be discussed in detail hereinafter.
In 1958 Hangar “ E ”, also in the Town of Harrison, an improvement whose taxability is sought in this action, was built by Westchester Hangar E, Inc., a corporation organized for that purpose, with the consent of the County. The tenants *1023 in this building and the use of it will be discussed in detail hereinafter.
Other improvements were made upon the County Airport property. A hangar and other structures for the National Guard were built entirely with Federal funds and leased by the County to the Federal Government. This installation is in the Town of North Castle and is not embraced within the contract between the County and the Operator.
Hangar ££ F ”, also within the Town of Eye, was erected by the Federal Telephone and Eadio Corporation before the County contracted with the Operator. It is presently occupied by Flight Electronics Corporation which is engaged in radio and electronic sales and service for the aviation industry. An additional subtenant builds and sells floats for aeronautical use.
Mohawk Airlines, the only scheduled airline using Westchester County Airport, presently makes six flights per day, Monday through Friday, two on Saturdays and three on Sundays. These flights are principally to points within New York State. Mohawk Airlines has no regular hangar space and makes use of the hangars only when its planes remain at the airport for servicing or maintenance by one of the fixed base operators.
The Federal Aviation Agency maintains traffic control at the airport. This service is furnished to an airport having 24,000 or more movements per year. It is discontinued if there be less than 18,000 flights per year. For the years 1954 through 1961 the total flights per year ranged from approximately 80,000 to 155,000 with the peak in the years 1957 through 1959. Of these total movements the air carrier flights (scheduled airline) ranged from approximately 5,500 to nearly 13,000 with the peak in the years between 1956 and 1959. There were approximately 9,800 such flights in 1961. Flights of itinerant and local military aircraft and itinerent and local, nonair carrier, civil aircraft made up the balance of the flights. For the year 1961 in which there were approximately 135,000 flights, approximately 4,700 were military itinerant, 3,800 military local, 71,000 itinerant, nonair carrier, civil and 46,000 local, nonair carrier, civil.
The Town does not now seek to tax the runways, taxiways or other improvements relating to the airfield or landing area and located within the Town. It seeks only in this action the taxation of the afore-mentioned Hangars <£ D ” and 1£ E ”.
With this general recitation the court shall now turn to the issues involved in this consolidated action.
In February of 1960 the Town brought its first action against the County to have declared subject to taxation Hangar ££ E ” *1024 and the parcel of land upon which it is situate,' containing 4.98 acres, designated on the 1959 assessment roll (taxes of 1960) of the Town of Harrison as Lot 8B, Block 971.. The complaint alleged: the County’s acquisition of the property;'-its'"contract with the Operator; the Operator’s agreement to erect structures on the airport property; the specific agreement for the construction of this Hangar ‘ ‘ E ” by the Westchester Hangar E, Inc.; the right of the subconcessionaire to peaceably and quietly hold and enjoy the demised premises without hindrance or molestation by any person; the provision that the hangar should be in turn sublet by the subconcessionaire to American Can Company and/or to the General Electric Company for the storage and maintenance of private corporate aircraft owned or operated by the subconcessionaire or its sublessees to provide transportation for its officers, employees and guests; that subleases were entered into between the subconcessionaire and General Electric Company and American Can Company and a further sublease was entered into between American Can Company and IT. S. Industries, Inc.; that they have been in possession thereof since January 1,1959; that Hangar “ E ” and the 4.98 acres of land upon which it stands appears upon the 1959 assessment roll (taxes of 1960) of the Town of Harrison with a land assessment of $7,660 and improvements assessment of $950,000 for a total assessment of $957,660; that said property is devoted to private rather than public use and consequently subject to taxation; and that the County claims the assessment to be illegal and the property exempt from taxation for State, County, Town and school purposes. The complaint was held legally sufficient by the Appellate Division (Town of Harrison v. County of Westchester, 13 A D 2d 708, infra).
Substantially all of the allegations of the complaint are admitted except the claim of the Town that the property is devoted to a private rather than a public use.
The County’s answer, in addition to this principal denial, alleged for a first defense a judgment entered on December 20, 1951, of Honorable Frederick P. Close, Official Referee, in favor of the County in an action brought by it against the Town to have that part of the County Airport and landing field located in the Town of Harrison exempt from tax (County of Westchester v. Town of Harrison, 201 Misc. 211).
For a second defense, the County alleged that Hangars “ B ” and “ D ”in the Town of Harrison, as well as Hangar “ E ”, the subject of the action, were used only for “ aviation purposes and other purposes required for or necessary to the efficient and successful operation of the said Westchester County Airport and *1025 Landing Field and for the operation of said Airport and Landing Field as a public airport or landing field for the general use of the public and for the benefit of the County of Westchester ”.
For a third defense and by way of counterclaim, the County alleged the execution of its agreement with the United States for its acquisition of the airport property, the improvement thereof by the Federal Government, the operation of the airport by the Operator, the assessment by the Town of Harrison, the improvements within the Town of Harrison and sought judgment declaring that all of the property in the Town of Harrison be exempt from taxation fqr State, County and Town taxes for the tax years 1947 to 1960 and exempt from taxes for school district taxes and assessments for the years 1946 to 1959 and that the Town vacate and annul all taxes levied upon and extended against the property of the County for the years 1946 to 1960.
The Town thereupon moved for summary judgment to the extent of the relief demanded in the complaint and for a severance of the issues raised by the counterclaim. The motion was denied and the complaint was dismissed.
The Appellate Division reversed the order dismissing the complaint and denied plaintiff’s motion for summary judgment and a severance of the issues, holding: “ In our opinion, the defendant’s second affirmative defense and the affidavits submitted in support of it present issues of fact as to whether the leases to the corporate tenants of the subject property and their use of the property were, as asserted by defendant, incidental to the proper conduct and maintenance of a public airport for aviation purposes and for other purposes required or necessary to the efficient and successful operation of such an airport for the general use of the public and for the benefit of the county (see General Municipal Law, § 352, subd. 5). In our opinion, on the issues presented, the undisputed facts disclosed by the record submitted are not sufficient to permit a declaratory judgment as a matter of law in favor of either party. The issues should be decided only after a trial, at which all the facts with respect to the operation of the airport, and the use of the subject property in connection with such operation, may be fully explored. ” (Town of Harrison v. County of Westchester, 13 A D 2d 708, 709, supra.)
Meanwhile, a second action was commenced in August, 1960, by the Town against the County whereby the Town sought to have Hangar “ D ” and 5.8273 acres of land appurtenant thereto declared taxable for the years 1954 through 1958. To the *1026 complaint the County answered, first, alleging as a defense the prior judgment of Mr. Justice Close (County of Westchester v. Town of Harrison, 201 Misc. 211, supra), secondly, alleging that the rental of Hangars “ B ”, “ D ” and “ E ” was “ only for aviation purposes and for other purposes required for or necessary to the efficient and successful operation of the said Westchester County Airport and Landing Field and for the operation of said Airport and Landing Field as a public airport or landing field for the general use of the public and for the benefit of the County of Westchester ”, and thirdly, that the pendency of the first action above mentioned was a bar to this action in view of the County’s counterclaim that this hangar as well as Hangar “ B ” and Hangar “ E ” be declared exempt. Judgment dismissing the complaint was thus prayed for.
Pursuant to the decision of the Appellate Division, trial was commenced on the first action to determine the taxability of Hangar “ E ”. Upon the opening of such trial the parties agreed to consolidate the second action brought by the Town to have that portion of Hangar “ D ” within the Town declared taxable.
There is also now before the court the counterclaim of the County that Hangar “ B ” as well as Hangars “ E ” and “ D ” be declared exempt from tax. The Town, by its pleadings, has not sought to have Hangar “ B ” declared taxable. The court is, thus, faced with the issues, should Hangar “ E ” and Hangar “ D ”, or either of them, be taxed or should Hangars “ B ”, “ D ” and “ E ”, or any of them, be declared exempt from tax.
A detailed examination of the history and use of Hangar “ E ” which was constructed in 1956 at a cost of $1,800,000 by Westchester Hangar E, Inc., an entity formed for that purpose, is now set forth.
On January 21, 1958 the County amended its lease with the Operator to permit the Operator to contract with Westchester Hangar E, Inc., to erect a hangar having dimensions of 168 feet by 640 feet, upon a parcel of land known as the Hangar Tract containing 4.98 acres, and upon completion of construction to rent the same to American Can Company and/or General Electric Company to be used only for the storage and maintenance of aircraft of those tenants to provide transportation for the officers, employees and guests of the aircraft owners. On the same day that the agreement between the County and the Operator was modified to permit this arrangement, agreements effectuating it were made between the Operator and Westchester Hangar E, Inc., between Westchester Hangar E, Inc., and the General Electric Company and betwreen Westchester Hangar E, *1027 Inc., and American Can Company. In June of 1958 American Can Company sublet a portion, of the premises to U. S. Industries, Inc. There was also a sublease by American Can Company to Allied Chemicals and by General Electric Company to General Dynamics.
The hangar was erected and the tenants went into possession on January 1, 1959, their tenancies to continue until 1977.
The portions reserved by American Can Company and General Electric Company have been used by them to base, house, service and maintain their aircraft for the use of their corporate personnel. American Can Company has no place of business in the County. General Electric Company has a research center and some sales outlets in the County but personnel at these installations rarely use the airport facilities.
U. S. Industries, Inc., carries on a variety of activities on the portion of the premises leased by it. Since 1960 it has operated a charter service providing flights for its tenants and a variety of corporations and individuals who are not tenants and most of whom are not residents of the County. Many of these charter flights neither originate nor terminate at the airport so far as the charterer is concerned. U. S. Industries, Inc., also is engaged in experimental work under Government contracts for the Army and Air Force. The performance of these contracts does not require the use of aircraft. It also uses its maintenance and service facilities in the demised premises to maintain and repair planes owned by it and regularly based at Hartford, Connecticut.
Westchester Hangar E, Inc., is given the right to “ peaceably and quietly hold and enjoy the demised premises without hindrance or molestation by any person ”. Westchester Hangar E, Inc., covenanted to ‘ ‘ use the Hangar Tract solely for the purposes of constructing or causing to be constructed a Hangar thereon and subletting the Hangar or the Hangar Tract to Canco [American Can Company] and/or G. E. [General Electric Company] and for no other purpose; and, no sublessee, under-tenant, assignee or transferee of the premises * * * [would] use the Hangar or the Hangar Tract * * # for any purpose other than the storage and maintenance of private, corporate aircraft owned or operated by [the tenant], sublessee, undertenant, assignee or transferee to provide transportation of its officers, employees and guests ”. Covenants appear in the leases between Westchester Hangar E, Inc., and the subtenants, American Can Company, General Electric Company and U. S. Industries, Inc., which provide that ‘ ‘ neither the Tenant nor any subleasee, undertenant, assignee or transferee *1028 of the demised premises or any part thereof shall use the same for any purpose other than the storage and maintenance of private, corporate aircraft owned or operated by the Tenant (or such sublessee, undertenant, assignee or transferee) to provide transportation of its officers, employees and guests”. Again, the lease provides “ that the landlord covenants that the Tenant, upon payment of the rent and performance of the covenants and obligations on the part of the Tenant to be performed hereunder, shall peaceably and quietly hold and enjoy the demised premises without hindrance or molestation by any person ”.
The rent payable by the Operator to the County was increased upon the completion of Hangar “B” and in addition the Operator agreed to pay the County a percentage of the rentals received by it from its subtenants.
Title to the hangar vested in the County upon its completion.
The court now turns to Hangar “ D ”, located partly in the Town of Harrison and partly in the Town of Eye, which was built in 1953 at an approximate cost of $2,000,000. The hangar is approximately 180 feet deep by 750 feet wide containing three bays, each with a width of 250 feet. A two-story lean-to 30 feet in width extends along the easterly side of the hangar. The hangar is located on the easterly side of the airport property and extends in a north-south direction, Bay 1 being the northerly one, Bay 2 the center one and Bay 3 the southerly one. About 300 square feet of Bay 2 is in the Town of Eye and one quarter of Bay 3 is in the Town of Eye. Twelve thousand nine hundred and twelve square feet of the Hangar is in the Town of Eye and 123,643 square feet is in the Town of Harrison.
The northerly one half of Bay 1 and a portion of the lean-to space in the rear of the hangar were leased to Johns Manville Corporation on July 21, 1953 for a term expiring March 31, 1967 which has the exclusive use of the hangar facilities demised to it for its own aircraft. It sublet to United States Steel Corporation a portion of the shop space in the lean-to and the right to store aircraft in the hangar space. United States Steel Corporation uses its hangar space to maintain and store its own aircraft.
The southerly one half of Bay 1 and adjacent lean-to space was rented on September 24,1952 to Sinclair Eeflning Company, Inc., which in turn sublet portions of its space to Columbia Has System Service Corporation and Cluett-Peabody Company, Inc., which use the space allocated to them for their own aircraft. Sinclair’s lease expires March 31, 1967.
*1029 Bay 2 was leased on May 31, 1954 for a term extending to March 31,19G7 to Union Carbide and Carbon Corporation which was given the exclusive use of the bay and related lean-to space and apron area. Union Carbide and Carbon Corporation sublet a portion of the lean-to space to Smith Meeker Engineering Co. which is engaged in the sale, installation, repair and servicing of aircraft radio and electrical equipment. A small portion of the lean-to space and a portion of the hangar space is further sublet by Union Carbide and Carbon Corporation to Stamford Rolling Mills Co. for the storage, maintenance and operation of its aircraft. Other areas of the lean-to are sublet, either from the Operator or from one of the subtenants, to Controlex Corporation of America and Safe Flight Instrument Corp. which use these areas for executive offices, laboratories, light assembly work, engineering, accessory, maintenance and repair, experimental and prototype shops and production and sales of aircraft instruments and accessories.
Bay 3 was leased originally to Flying Tiger Lines, Inc., which never carried on any activities at the airport. It sublet its entire space to United Skyport Corporation which was given the exclusive use of one third of the hangar and the related lean-to and apron space to repair, maintain, service and store aircraft, to operate a ground school and to retail aviation fuel and lubricants. United Skyport Corporation has as its chief subtenants Creen Air Service, Inc., and Star Flight, Inc. The former renders its services and repairs to aircraft regularly using the airport and to aircraft not based at the airport but which come to the airport solely to be serviced by it. The other tenant, Star Flight, Inc., is engaged in charter service and aircraft sales and service. Other tenants of United Skyport Corporation rent space in which geoscientific and geotechnical studies and research are conducted and aircraft accessories, radio and electronic equipment are serviced and sold. Other portions of the hangar and lean-to area are sublet to various corporations for the storage and maintenance of their privately owned aircraft for use by their personnel.
The Town, as afore-mentioned, seeks by its action to tax the above-described Hangars “ D ” and “ E ”. The County, by its counterclaim, seeks to have a determination that Hangar “ B ” as well as Hangars “ D ” and “ E ” should be declared exempt from tax. The court must, thus, consider the use of Hangar “B”, not to determine its taxability but to determine whether the County is entitled to a judgment that it be exempt from tax.
Hangar “ B ” is small, being 60 feet square and of frame construction covered with corrugated metal. Its cost is estim *1030 ated to be $20,000. It is, thus, a quite different structure from Hangars “ D ” and “ E ”, the costs of which have been indicated, and both of which were built of substantial materials of a permanent nature. The tenant, Westchester Aeronautical Corporation, is given the nonexclusive right in the premises to repair and maintain aircraft, provide for inside storage and parking and tie downs, to lease aircraft and to provide charter service and to maintain a flying school. The tenant affirmatively covenants that it will exercise these rights. There is nothing in the lease with the tenant or no other evidence indicating that any exclusive rights in the premises have been given to any person or corporation which would exclude the use and enjoyment of these premises by the public desiring to avail themselves of the facilities or services offered.
The County seeks to justify its claim of tax exemption on four main grounds: (1) that the prior judgment in the action (County of Westchester v. Town of Harrison, 201 Misc. 211, supra), which declares the property exempt is res judicata as to the issues herein; (2) that subdivision 5 of section 352 of the General Municipal Law permits a county to lease an airport in its entirety for use as a public airport and since the airport was leased pursuant to that section, the use is a public one; (3) that the agreements with the Federal Government for the improvement of the airport and the Federal statutes relating thereto provide that the airport be used by the public, and the use, thus, is public; (4) that the hangars are used only for aviation purposes and for other purposes required for or necessary to the efficient and successful operation of the airport and landing field as a public airport for the general use of the public and for the benefit of the County and thus must be considered exempt from tax. These points will be discussed in the order given.
There is no merit to the County’s claim that the judgment rendered by Official Referee Close in December, 1951 (County of Westchester v. Town of Harrison, 201 Misc. 211, supra) is res judicata. That action was brought to cancel taxes assessed by the Town for all airport property within the limits of the Town. Hangars “ D ” and “ E ” were not then in existence. Their taxable status could not, of course, have been determined by Judge Close. Furthermore, the prior determination was for the taxable status of the property for the years 1945 and 1946 while the present action seeks to validate assessments for the years 1954 and following. Determination of the taxable status of any one year is not res judicata for any other year. Each assessment is a separate proceeding (People ex rel. Hilton v. *1031 Fahrenkopf, 279 N. Y. 49). This rule applies in exemption cases (People ex rel. Watchtower Bible Soc. v. Haring, 286 App. Div. 676).
Nor is there any merit to the County’s contention that its lease to the Operator pursuant to subdivision 5 of section 352 of the General Municipal Law requires a determination that the use is public and thus exempt from tax.
Subdivision 5 of section 352 of the General Municipal Law provides that a county which has acquired an airport may: “ 5. Lease, or sub-lease the real property or lease, contract or otherwise agree, on an exclusive or non-exclusive basis, for the entire operation of such airport or landing field, or of any part thereof, or for the rendering of various services, or the conduct of business activities, on or at said airport or landing field subject to the provisions of section three hundred fifty-two-a of this chapter; provided, however, that no such lease or contract shall be made until the governing body of the municipality shall have held a public hearing in respect thereto on at least ten days notice published in two newspapers having general circulation in the municipality, and provided further that any lease of an entire or portion of an airport or landing field, together with the facilities thereon, or contract for the operation of an airport or landing field or portion thereof shall be for a term not exceeding forty years and shall expressly provide that the said airport or landing field shall be used only for aviation purposes and for other purposes required for or necessary to the efficient and successful operation of an airport or landing field, upon such terms as shall require the operation of the same as a public airport or landing field for the general use of the public and for the benefit of such city, county, village or town.”
This statute is not, as suggested by the County, determinative of the issues herein. It was enacted to remove any doubt as to the power of a county or other municipality to lease or contract for the entire operation of an airport. It is an enabling statute and not a taxing statute. It begs the question to assert that merely because the County leased the airport to the Operator under the power granted it by this statute, the use made of particular buildings must necessarily be for “the general use of the public ’ ’. Whether or not the hangars in question are in fact being operated for “ the general use of the public ” was the principal issue of the lengthy trial herein and is the ultimate fact to be determined by the court from the evidence presented.
*1032 The County further contends that the use of the hangars in question must be determined to be a public use since its contract with the Operator provides “ The airport shall at all times be satisfactorily operated in the opinion of the Owner for the purposes contemplated by this agreement, namely: As a public airport for the benefit of the County of Westchester
This is a specious argument. An agreement does not always reflect what the actual operations of the parties thereto are in fact. In determining whether the use of the hangars in question be public or private, the court looks not to the words of the agreement, but to the facts of actual operation.
This holding applies also to the argument with respect to the agreement between the County and the Federal Government. The Federal Aviation Agency Regulations (U. S. Code, tit. 49, § 1349, subd. (a), formerly U. S. Code, tit. 49, § 453) indicate that no exclusive use may be granted for runways, landing areas or navigational facilities. There is no claim here that these areas or facilities have in any way been taken from the public use or in any way restricted. As above mentioned, the Town is not seeking to tax these facilities. These regulations cannot be determinative of the issue of the tax-ability of hangars so located on areas of the airport as not to interfere with these facilities, although making use of them in common with others.
The argument of the County is rendered even more untenable in view of the subleases to the tenants in Hangars “ E ” and “D” which are given exclusive rights therein. The County approved these agreements.
The crucial question is what use is actually being made of the properties in question. The statutory provisions affecting the taxability of these three hangars are found in subdivision 1 of section 406 of the Real Property Tax Law, which reads in pertinent part: “ Real property owned by a municipal corporation within its corporate limits held for a public use * * * shall be exempt from taxation ” (emphasis supplied). Are these hangars “ held for a public use ” within the meaning of this statute and thus entitled to tax exemption?
In County of Herkimer v. Village of Herkimer (251 App. Div. 126, affd. 279 N. Y. 560) the court held that property purchased by the county at a tax sale was not exempt from village taxation. The exemption was claimed under former subdivision 3 of section 4 of the Tax Law (now Real Property Tax Law, § 406, subd. 1).
*1033 Although the case is not precedent for the precise issue at bar, holdings therein concerning the principles of exemption and the definition of ‘ ‘ public use ’ ’ are applicable.
“In determining whether plaintiff’s property comes within such exemption, certain general and well-established principles must be constantly borne in mind.
“It is the policy of the law to require all property to bear its just share of the expenses of government. That is a just and equitable rule. Unless expressly exempt by statute, all real estate, no matter by whom it is owned, is taxable. (Tax Law, § 3; People ex rel. Gould v. Barker, 150 N. Y. 52, 56; People ex rel. Savings Bank of New London v. Coleman, 135 id. 231, 234.)
‘ ‘ ‘ An exemption from taxation is in the nature of a renunciation of sovereignty. It relieves one class of persons or property from its obligation to bear its share of the expenses of government, no matter how deserving of assistance that class may be, and throws a correspondingly heavier burden upon all other classes, thus creating an inequality of taxation. It is for this reason that the courts have uniformly refused to favor exemptions, and have invariably construed statutes freeing property from the burden of enforced contribution to the expense of maintaining the government most rigidly against the claimant, and have declined to countenance such immunity unless the language of the statute is clear and unambiguous, and unless the purpose of the Legislature to exempt such property indisputably appears. ’ (Matter of Board of Education of City of Jamestown v. Baker, 241 App. Div. 574; affd., 266 N. Y. 636.)
“ A grant of immunity to persons who, or property which, would otherwise be liable to assessment is never presumed. It will not be recognized unless granted in terms too plain to be mistaken. If there is any doubt as to the intent of the Legislature, it must be resolved in favor of the taxing power. [Authorities cited.] ” (251 App. Div. 127.)
The court defined “public use “ The expression 1 public use ’, as employed in the statute, has never been defined with exactitude. Its meaning must necessarily depend upon the peculiar circumstances of each case. * * * ‘ Held for a public use,’ in this connection, means that the property should be occupied, employed, or availed of, by and for the benefit of the community at large, and implies a possession, occupation and enjoyment by the public, or by public agencies. [Authorities cited.] ” (251 App. Div. 128.)
The exclusive use of Hangar “ E ” has been given to three principal tenants under long-term leases which insure to them *1034 complete dominion over the premises demised to them for the express purpose of storing and maintaining their privately owned aircraft. One tenant, without written authority therefor, is actually engaged in the performance of contracts it holds with the Federal Government. The use, prescribed by the leases insofar as the storage and maintenance of the tenants’ aircraft is concerned, and the use of a portion of the hangar for contract work with the Government, completely excludes the public from the benefit and use of this property. Clearly, Hangar “ E ” is not held for public use within the meaning of the statute and is not therefore entitled to an exemption.
With respect to Hangar “ D ”, many tenants under long-term leases, with either the Operator or its tenants, are given exclusive possession of major portions of the hangar. Although their leases do not prescribe the use they may make of the premises, three of them have been using the premises for the maintenance and storage of their own aircraft. Several subtenants occupying portions of the hangar are engaged in research, light assembly work, engineering and experimental work. Activities pursued by these tenants in the course of their respective businesses, whether it be the operation of the aviation division of the corporate tenant or the pursuit of these other endeavors, in no way benefits the public using the airport. There is, thus, by reason ol' the use of the premises made by the tenants, the same exclusion of the public from Hangar “ D ” that there is by use as well as by the terms of the leases in Hangar “ B ”, Hangar “ D ” is, accordingly, found not to be held for a public use within the meaning of the statute and is not exempt from tax.
With respect to Hangar “ B ”, the tenant agreed with the Operator to use the facilities demised to it for the operation of a flying school, the servicing and maintenance of aircraft, the operation of a charter service, to provide storage and parking of aircraft within the hangar, and to provide tie-down space .outside the hangar. There is no evidence to indicate that any exclusive rights have been granted to any firm or individuals for the use or enjoyment of these facilities. It is, thus, proper to assume that these facilities are available to the public and used by the public. It is not difficult to distinguish between Hangars “ E ” and “ D ” on the one hand, and Hangar “ B ” on the other hand. The facilities of Hanvar “ R ” are enjoyed by and are available to the public. The public may avail itself of flying instructions, charter service and parking and maintenance of aircraft. No arrangements have been made with select firms, individuals or corporations, to give them any exclu *1035 sive rights to these facilities. The use of Hangar “ B ” is determined to be public and it is thus exempt from tax.
The court’s attention has not been directed to any New York authorities holding portions of a municipal airport taxable and other portions not taxable. Decisions in other jurisdictions, however, indicate that this has been done.
In Inhabitants of Owls Head v. Dodge (151 Me. 473 [1956] the Supreme Judicial Court of Maine affirmed the Superior Court’s decision holding certain portions of airport property tax exempt while holding other portions subject to taxation. In that case the Superior Court had found that five buildings on the airport property had been used for other than public purposes and that the public use had been merely incidental or trivial to the private use of the property. These buildings were declared not exempt from taxation.
The Ohio Supreme Court in City of Toledo v. Jenkins (143 Ohio St. 141 [1944]), recognized the necessity for apportioning the taxability of municipal property. While determining that the major portions of a municipal airport were tax exempt, the court nevertheless held taxable two residences and garages located on the airport property and occupied by the airport manager and a service man, respectively. The Ohio court reasoned that it would not be essential for tax exemption that all property that is part of a municipal airport be used for public purposes. “ A building might be antiquated for airport purposes and rented for manufacturing or other private business. Thereupon the building and land appertaining to it would cease to be used ‘ in the exercise of municipal functions ’ and would become taxable.” (City of Toledo v. Jenkins, supra, pp. 151-152.)
Nonprofit organizations are entitled to a tax exemption on portions of their property used excluí ,/ely for their corporate purpose while other portions not so used ir ay be taxed (Real Property Tax Law, § 420, subd. 2; Young Women’s Christian Assn. v. City of New York, 217 App. Div. 106, affd. 245 N. Y. 562). A single structure may thus be treat ;d partly taxable and partly exempt. There would seem to be no valid reason why separate structures on a large parcel, such as the airport, could not be treated separately, some taxed, some exempt.
The County established that tenants in Hangars “ E ” and “D” had invested large sums in their aircraft and that covered areas or hangars were necessary to store, service and maintain them properly. Granting the obvious truth of this proposition, the court nevertheless is not impressed that this fact constitutes the hangars housing such private aircraft as *1036 incidental to the operation of a public airport. These hangars were built for the exclusive use of the tenants. In fact, in the case of Hangar “ E ”, the'tenants were specified before construction even began. The principal tenants are large corporations who maintain their aviation divisions at the airport so that aircraft will be at the use and disposal of corporate personnel. Why should these tenants have available to them, for the maintenance and operation of their private aircraft, exclusive possession of tax free structures?
It cannot be argued that the airport’s operation is dependent upon the tenancy of these occupants of Hangars “ E ” and “ D ”. The airport was in operation for several years prior to the erection of these hangars. The flight volume is well above that required for Federal Aviation Agency support of the control tower. There are many local and itinerant non air carrier flights and there has been no breakdown to show what portion of those flights are made by the tenants of Hangars “ E ” and “ D There is nothing to indicate that the continuance of this support is dependent upon the flights.of these tenants.
The court is aware of the decision in Bush Term. Co. v. City of New York (282 N. Y. 306) relied upon by the County. It is not analogous to the case at bar. In the Bush case the Port Authority was given by statute power to erect an inland freight terminal and to erect above the track level a building having offices, warehouses and commercial space which it rented out. The statute permitted the Authority to voluntarily agree to pay the municipality taxes in an amount not to exceed the taxes paid on the land and buildings prior to the erection of the terminal. Suit was brought to force the Authority to pay taxes on this improvement comparable to other commercial buildings.
The court said: “ Of course, the power to construct terminals which incidentally contain ‘ storage space and space for other facilities ’ might be transcended if, under cover of that power, the Port Authority assumed to construct an office or loft building intended primarily for revenue and only incidentally for terminal purposes. The factors involved are often relative, not absolute, and the test may be one of degree. (Cf. Kaukauna Water Power Co. v. Green Bay & Mississippi Canal Co., 142 U. S. 254.)” (282 N. Y. 316.)
“ Property held by an agency of the State is ordinarily immune from taxation only while it is used for a public purpose. Property used primarily to obtain revenue or profit is not held for a public use and is not ordinarily immune from taxation, but property held by a State agency primarily for a public *1037 use does not lose immunity because the State agency incidentally derives income from the property. (2 Cooley on The Law of Taxation [4th ed.], § 640; Inhabitants of Wayland v. County Commrs. of Middlesex, 4 Gray [Mass.], 500. Cf. People ex rel. Mayor v. Board of Assessors, 111 N. Y. 505.) Here the evidence and the findings and conclusions of the court at Special Term establish beyond possibility of successful challenge that the use of the building above the terminal for purposes of revenue is purely incidental to the purpose of the Port Authority to operate a terminal facility at a charge which the consumer can pay. There is here no purpose to make a profit and without the use of the upper stories of the building for revenue the public purpose could not be carried out ” (pp. 321-322).
There is no showing here that the airport could not operate without Hangars “E” and “ D ”. The County has transcended its power to develop the airport for a public use by permitting the hangars to be devoted to private use. As stated in the Bush case,11 The factors involved are often relative, not absolute, and the test may be one of degree ’ ’. (Supra, p. 316.)
The judgment prayed for by plaintiff in the consolidated action, namely that Hangar “ E ” and the land upon which it is situate, 4.98 acres, designated by the plaintiff on the 1959 assessment roll (taxes of 1960) of the Town of Harrison as Lot 8B, Block 971, be declared taxable, is granted. Plaintiff’s prayer that Hangar “ D ” and 5.8273 acres of land appurtenant thereto upon which it is situated designated on the assessment roll of the Town of Harrison for the years 1954, 1955, 1956, 1957, and 1958 as Lot 8A, Block 971, as corrected, is subject to taxation is granted as to that portion of said premises situate in the Tovm of Harrison. The defendant’s counterclaim that Hangar “ B ” be declared exempt from tax is granted. The defendant’s counterclaim that Hangars “E” and “ D ” be declared exempt is denied.