In cause No. 29504 the sole question is the extent to which the real estate of Toledo Municipal Airport is exempt from taxation. Under the provisions of Section 5616, General Code, the application, having been filed in 1938, raised the question of exemption for that year only. Pfeiffer et al., Trustees, v.Jenkins et al., Board of Tax Appeals, 141 Ohio St. 66,46 N.E.2d 767.
The first inquiry naturally relates to the nature of the property and the law which governs.
Section 4 of Article XVIII of the Constitution gives *Page 150 
municipalities power to "acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants."
Section 3677, General Code, provides, inter alia:
"Municipal corporations shall have special power to appropriate, enter upon and hold real estate within their corporate limits. * * *
"15. For establishing landing fields either within or without the limits of a municipality for aircraft and transportation terminals, with power to impose restrictions on all or any part thereof and leasing such part thereof as may be desired for purposes associated with or incident to such aircraft landing and transportation terminals, * * * all of which are hereby declared to be public purposes."
Section 3939, General Code, provides, inter alia:
"Each municipal corporation in addition to other powers conferred by law shall have power: * * *
"(22) To purchase, lease or condemn land and/or air rights necessary for landing fields, either within or without the limits of a municipality, for aircraft and transportation terminals and uses associated therewith or incident thereto, * * * and to improve and equip the same with structures necessary or appropriate for such purposes."
The statutory provisions confer upon the municipal corporation power to own or lease and operate landing fields and improve them with runways, buildings or other structures, so as to make them fully equipped aircraft and transportation terminals. As an airport of that character is a public utility (State, ex rel. Chandler, v. Jackson, 121 Ohio St. 186,167 N.E. 396), the Toledo Municipal Airport was and is a complete public utility unit.
Under and by virtue of Section 2, Article XII of the Constitution, general laws may be passed to exempt *Page 151 
from taxation "public property used exclusively for any public purpose."
Section 5351, General Code (110 Ohio Laws, 78), provided,inter alia, that "public property used for a public purpose shall be exempt from taxation."
Section 5351 controls but its language must be read in the light of the language of the Constitution. The test, then, is whether the realty was public property used during the year involved exclusively for a public purpose.
Underlying that test are three essential prerequisites. (1) The realty must be public property; (2) the use must be for a public purpose; and (3) the use must be exclusively for that purpose.
The first prerequisite is not difficult of application. It is fundamental that property lawfully owned and controlled by a municipal corporation is public property Thus the realty of a municipally owned and operated public utility is public property and exempt from taxation when the elements of use are such as to work exemption; but the realty of a privately owned and controlled public utility is not exempt though the use may properly be said be in compliance with the second and third prerequisites.
During the period for which exemption is sought the title to all the land and structures thereon except the building known as the west hangar was in the municipality and was public property.
The second prerequisite involves the element of public use. In the case of State, ex rel., v. City of Toledo, 48 Ohio St. 112, 26 N.E. 1061, 11 L.R.A., 729, it was stated that "it is now the well-settled doctrine throughout the several states, that the business of public highways, turnpikes, bridges, canals, and other public means for travel and for the transportation of goods, are a public use within the Constitution."
That the use of essential public utility property in *Page 152 
the operation of the utility is a public use cannot be gainsaid. See City of Toledo v. Hosler, Treas., 54 Ohio St. 418, 43 N.E. 583. A ticket office, waiting rooms, baggage rooms, storage space, administrative offices, light control, dining rooms, facilities for repairs and the furnishing of gasoline are necessary to a complete public utility airport unit. Then, too, aviation in a particular area must find its center in some airport. Public utilities are created to render service to the public and for the service a charge is made. Any incidental use allied to the main public purpose is likewise public. Renting space in buildings to others to promote aviation by extending service at the airport to all the public using its facilities would be a use incidental to the main public purpose. Moreover, the mere fact that revenue is received for the space so rented does not change the public aspect, so long as the purpose of the utility is subserved and the objective is not primarily to obtain revenue. It is the "primary and principal" use that controls and the fact that incidental revenue is derived from the property does not in and of itself alter the public character of the use to which the property is put. For authorities see annotation 101 A. L. R., 790. So all the real estate necessary and incidental to the operation of a municipally owned and controlled airport unit would in its operation be concerned with a public use.
The third essential prerequisite involves the concept of exclusive use for a public purpose. What is the meaning of the word "exclusively?" It is not essential to exemption that all the property that is part of the utility unit be used for public purposes. A building might be antiquated for airport purposes and rented for manufacturing or other private business Thereupon the building and land appertaining to it would cease to be used "in the exercise of municipal functions" *Page 153 
and would become taxable. City of Cincinnati v. Lewis, Aud.,66 Ohio St. 49, 63 N.E. 588.
The next step in orderly procedure is to analyze the various parcels, the structures thereon and their uses in order to make a concrete application of the principles pronounced.
When the agreed statement of facts is read in conjunction with the plat, exhibit A, it is definitely disclosed that parcels A, B, C, D, E, F and G have runways and landing fields upon them, the runways being on parcels A, B, D and E and the 80 acres of parcel C abutting on Krueger road. Exclusive of land with buildings thereon (which land and buildings will be considered later) all of these parcels are so clearly public property devoted exclusively to a public use that we have no hesitation in saying that they were exempt. Even though the 14.53 acres of parcel C abutting on Cummings road and parcels F and G in the year in question had not had landing fields upon them, they, being in such close proximity to the runways, were necessary in the operation of the airport, as large airplanes in the ascending and descending incidental to landing and taking off require considerable open space for safety. The acreage would not have been excessive whether landing fields were on them or not. Parcel H (excluding from consideration for the time being the part on which the residence, barn and garage were located) does not have runways or landing fields and so far as appears from the record was not used for any purpose connected with the airport and was not exempt. It appears that these parcels, except where the runways and the buildings are located, are in large part sowed with alfalfa and that the alfalfa is cut and sold on the market. It could hardly be expected that the fields would be allowed to grow up with weeds and the mere fact that a profit is made from the sale of the alfalfa does not change the character *Page 154 
of the use of the land, on which it is grown, from a public to a public one.
The parts of parcel B on which buildings were located and the buildings themselves were held taxable. Among the buildings were the house and garage occupied by the manager as a residence, together with 1.06 acres of land on which the house and garage were located. On parcel H are a residence, occupied by the service man, a garage and a barn. These residences and garages stand on the same footing as to taxability. Workmen who by reason of their duties are required to sleep on the premises may be provided with sleeping quarters and the purpose would be public. An instance of this use is where such quarters are provided for firemen at a municipal engine house. Providing a residence with garage for a manager, service man, or other officials or employees is beyond the scope of utility service. Buildings so used, whether a rental charge is made or not, would be subject to taxation. However, the barn, which is used to store airport tools and equipment, together with the necessary land on which it is located, is exempt.
The other buildings on parcel B will be considered in order.
The east hangar is used for offices, airplane storage, repair shop, boiler room and toilets.
Prior to 1940 the offices were vacant. So no question arises about renting them since the application for exemption covers only the year 1938. It is well known that in constructing buildings of this character it is necessary to make them somewhat larger than present needs require to allow for growth in the future. Transportation by airplane is still in its infancy. Airplanes are becoming larger and more commodious with each advancing year. The Douglas B-19 constructed in 1942 carries a bomb load alone of 12 tons and has a wing spread of 212 feet. Future requirements *Page 155 
for transportation of passengers and property will create need for larger buildings and more office space, so the fact that offices existed which temporarily could not be used or rented cannot be considered a factor which destroys the public character of a building's use.
A question is made as to the storage of the airplanes of individuals, at established rates. In this matter there is precedent to guide us. In City of Cleveland v. Ruple, 130 Ohio St. 465, 200 N.E. 507, 103 A. L. R., 853, the facts disclosed that the city of Cleveland had erected a public underground exhibition hall for holding public exhibitions and to provide space for garage and other purposes. The language used in the fourth paragraph of the syllabus is apposite here:
"Such a public underground exhibition hall may be used by the municipality for all public purposes and all purposes incidental thereto, including the right to afford to patrons of adjacent municipal buildings, to wit, a public stadium and a public hall, parking and storing privileges, and a reasonable charge therefor may be made."
The analogy is close. The individual airplanes are stored so the public in using them may avail themselves of all the facilities of the airport, which are maintained for public use. Such storage is therefore a use incidental to the main purpose and is not altered because a proper and fair charge is made therefor. The service accorded to owners of private airplanes is as much a public use as is the service accorded to the companies that operate commercial airplanes in carrying passengers, express or freight.
The "tenants" used the repair shop without extra charge. A service was thus provided which was essential and without which airplanes could not be operated. Likewise the boiler room and toilet facilities were necessary for the health and comfort of those engaged *Page 156 
in operating the airport and for the public visiting it. The whole east hangar was used exclusively for public purposes and should be exempted.
The one-story brick substation with frame and glass tower was erected in the spring of 1938 and was used to house transformers, distribution system and electric equipment. It had an office at which gasoline sales were recorded and outgoing ships registered. Above the office was a floodlight for field illumination with controls for traffic and all other lighting facilities. All of these uses are essential in the operation of an airport. A question arises about office space in which records were kept with respect to the sales of gasoline but this use was a necessary incident to the main purpose. A municipality may not enter business which has not the element of public utility or public function, as has been pointed out, but the sale of gasoline and the maintaining of offices and buildings to aid in accomplishing that end would be necessary in the operation of the public utility which is maintained under the name of Toledo Municipal Airport. This building should be exempted.
The west hangar is used in part for the administrative office and waiting room for the general public. Some of this office space is leased at a nominal rental to the United States Department of Agriculture (presumably for a weather bureau) and to the United States Department of Commerce (presumably for aeronautic purposes). United Air Lines, Inc., and Transcontinental Western Line, Inc., rent office space and the Metcalf Flying Service a classroom, on a monthly or yearly basis. Hangar space is rented to private owners at fixed rates.
Much that has been said about the east hangar would be applicable here and need not be repeated. There is no reason why air-line transportation companies may not rent space for airport purposes without *Page 157 
changing the public aspect of the utility unit. The Metcalf Flying Service conducted a training program which, of course, required aeronautic facilities. No charge or only a nominal charge is made for the other space rented. These uses are all, indeed, incidental. The renting to individual owners of airplanes has been previously considered, and, as carried on, is deemed a public use.
The land on which the west hangar is and was located does not stand on the same footing as the hangar itself with respect to exemption. In 1929 under and by virtue of an indenture (exhibit C) land was leased by Transcontinental Airport of Toledo, Inc., to Curtiss Flying Service of Ohio, Inc., at an agreed rental for a term of 20 years with a stipulation that the building erected thereon should at the end of the term belong to the lessor. There was a clause in the indenture of lease which gave the lessor upon termination of the leasehold for any cause an option to buy such building at cost less 5% depreciation for each year the lease "shall have run." In 1936 an agreement, exhibit D, was executed between Mevon Corporation (which had acquired all rights formerly belonging to Curtiss Flying Service of Ohio, Inc.) and the receiver of Transcontinental Airport of Toledo, Inc., by which the payment of rental for the land was forgiven and the receiver was to pay a substantial fixed rental to Mevon Corporation for the building which is known as the west hangar and in addition all taxes on the building. This agreement expired December 31, 1938.
Later in 1936 the city of Toledo acquired the rights and interest of Transcontinental Airport of Toledo, Inc., and of its receiver, and in 1939 an agreement (exhibit E) was entered into between the city of Toledo and Mevon Corporation by which the terms of the contract (exhibit D) became binding as between them and were extended for two years. By virtue of these *Page 158 
agreements the city of Toledo became obligated to pay the taxes on the building and the rental therefor until the expiration of the extended agreement on December 31, 1940. So in the years 1937 to 1940 inclusive the city of Toledo was the owner of the land on which the west hangar stood without receiving rental therefor and Mevon Corporation was the owner of the building which was under lease to the city of Toledo at a substantial rental. During that period of four years all the airport property, including the west hangar, was listed on the tax duplicate. Specifically the west hangar was listed thus:
"City of Toledo Airport * * * Hangar on leased land * * *."
This hangar was a one-story building of brick and concrete block, 100 x 120 feet in size. To it there was a two-story office and waiting room addition, 22 x 120 feet in size, with part basement. In addition there was a one-story brick and concrete ticket office 10 x 41 feet in size.
This building, annexed to the real estate in the way it was, was essentially real estate. The county auditor therefore correctly placed the building on the tax duplicate as real property separately from the land; but should have listed the structure in the name of the Mevon Corporation.
Under such circumstances the city would not be relieved of its contractual obligations even though the building was used exclusively for a public purpose. The contract bound the city to pay the taxes as between it and the Mevon Corporation, although the building was listable in the name of the latter. The fact that the building would become the property of the city at the end of the twenty-year term under the original lease of the land upon which this hangar was constructed or sooner if the option should be exercised does not alter the legal situation; nor does the fact that the city acquired *Page 159 
the building in 1941. The west hangar was, therefore, taxable and should have been placed on the tax duplicate in the name of the lessor-owner, the Mevon Corporation, although the city leased it for airport purposes. Humphries, Aud., v. LittleSisters of the Poor, 29 Ohio St. 201. The land on which the building stood, however, is exempt due to the use to which the building was put.
The agreed statement shows that during the year involved here as well as the two succeeding years the commercial use of the airport was greatly restricted due to lack of suitable runways and that during that time extensive improvements and additions to runways were made. The agreed statement, however, when read as a whole discloses that the uses were the same and the questions presented are not changed because the commercial use was restricted.
As to cause No. 29505, merely a question of jurisdiction is presented. On August 13, 1941, the appellant filed with the Board of Tax Appeals application No. 6202 for the exemption of the same property involved in cause No. 29504; but filed no application for the remission of taxes for prior years.
By amendment (effective August 21, 1941) provisions were inserted in Section 5570-1, General Code, which read thus:
"The Board of Tax Appeals shall not consider an application for exemption of property under any of the sections enumerated herein unless the application has attached thereto a certificate or affidavit executed by the county treasurer certifying that taxes, assessments, penalties and interest levied and assessed against the property sought to be exempted have been paid in full to the date upon which the application for exemption is filed.
"Provided, however, that taxes, penalties and interest which have accrued after the property began its *Page 160 
use for the exempt purpose but in no case prior to the date of acquisition of the title to said property by applicant, may be remitted by the county auditor, with the consent of the board of tax appeals."
Previous to the amendment the attachment of such a certificate or affidavit to the application was not required. It is contended by appellant that the general saving statute of Section 26, General Code, makes the quoted provision of Section 5570-1 inapplicable. We accede to this contention. The filing of an application for exemption (which, as heretofore indicated, could apply only to the year in which it was filed) instituted a pending proceeding within the meaning of Section 26. State, ex rel. Cleveland Ry. Co., v. Atkinson, Admr.,138 Ohio St. 157, 160, 34 N.E.2d 233. As it was not expressly provided in the amending act that it should apply to pending proceedings, the application, having been filed before the amendment became effective, was sufficient without having attached thereto such a certificate or affidavit. The Board of Tax Appeals committed prejudicial error in dismissing application No. 6202 for want of jurisdiction in that the statutory provisions had not been followed.
In cause No. 29504, the decision, holding exempt the 352 acres on which the runways are located, and holding taxable the dwelling houses, garages, west hangar and parcel H, is affirmed, but as to the barn on parcel H, and a reasonable amount of land surrounding it, and in all other respects, the decision is reversed and the cause remanded for further proceedings not inconsistent with this opinion.
In cause No. 29505 the decision is reversed and cause remanded for further proceedings.
Judgments accordingly. *Page 161 
WEYGANDT, C.J., MATTHIAS, HART and ZIMMERMAN, JJ., concur.
BELL, J., concurs in paragraphs 1, 2, 3, 4, 5, 7, 8 and 9 of the syllabus and in the judgment.