Doyle, J.
We here review the judgment of the Court of Appeals which, in effect, holds that the city of Cincinnati has a legal right to appropriate a public street in an adjacent municipal corporation, over the objection of such municipal corporation, for the construction of an airport.
The second amended answer states the following facts which we accept as true for the purposes of the demurrer:
*347 1. “* * * in the year 1945 it [city of Cincinnati] took the necessary legislation and other action to establish an airport, commonly known as the Cincinnati Municipal Airport, in what was then an unincoi’porated portion of Sycamore Township, commonly known as Blue Ash. ’ ’
2. “ * * * [The city of Cincinnati] has prepared plans for the construction of a feeder type airport on its property in Blue Ash, presently consisting of 1,600 acres; that said plans have been approved by the Civil Aeronautics Authority and by the Ohio Aviation Board; that the principal runway for the airport bisects that portion of Plainfield Road [now a public street in the village of Blue Ash] described in the amended petition and that it is, therefore, necessary for the * * * city of Cincinnati to acquire the existing easement for street purposes over said property in order to construct said airport.”
3. “* * * the proposed airport cannot be constructed without acquisition by the city [Cincinnati] of the property described in the amended petition and that the street system within the * * * village of Blue Ash will not be materially affected by the appropriation by the city of the portion of Plainfield Road [village of Blue Ash street] * * # because the road located on said property can be relocated over adjacent property owned by the * # * city of Cincinnati which said city will make available for said relocation.”
4. “* * * the zoning ordinance of the village of Blue Ash, which purports to prohibit the construction of airports having runways in excess of 3,000 feet, was passed in the year 1957, after the * * * city of Cincinnati had expended millions of dollars in the acquisition of property for airport purposes within the now existing.limits of the village of Blue Ash.”
Section 4, Article XVIII of the Constitution of Ohio, provides :
“Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service. The acquisition of any such public utility may be by condemnation or otherwise, and a municipality may acquire thereby the use of, or full title to, the *348 property and franchise of any company or person supplying to the municipality or its inhabitants the service or product of any such utility.”
It is obvious that this provision in the Constitution is self-executing (Link v. Public Utilities Commission, 102 Ohio St., 336) and gives general powers to the city of Cincinnati to acquire property by eminent domain within or without its corporate limits for the construction of a public utility. We entertain no doubt that the proposed airport in the instant case must be classed as a public utility which may be operated by the city in its proprietary capacity. City of Toledo v. Jenkins et al., Board of Tax Appeals, 143 Ohio St., 141.
It is observed, however, that when this provision in the Constitution was adopted in 1912, the creators thereof were thinking in terms of electric power, water, and railroads, as evidenced by the proceedings and debates in the constitutional convention. Airports with two- and three-mile runways necessary to accommodate jet planes, if thought of at all by the framers of the Constitution, were but figments of the imagina- ' tion. The use of aircraft in commerce came years later.
As a result of the development of aircraft as instruments of commerce after the adoption of the provision in the Constitution, legislation was enacted to specifically meet the problems of the new era. In the chapter, “Specific Powers” (given to municipal corporations), Section 717.01, Revised Code, provides :
“Each municipal corporation may:
l i * # #
‘ ‘ (V) Acquire by purchase, gift, devise, bequest, lease, condemnation proceedings, or otherwise, real or personal property, and thereon and thereof to establish, construct * * * equip, maintain, and operate airports, landing fields, or other air navigation facilities, either within or without the limits of a municipal corporation, and acquire * * * rights of way for connections with highways * * * and improve and equip such facilities with structures necessary or appropriate for such purposes; no municipal corporation may take or disturb property or facilities belonging to any public utility or to a common carrier engaged in interstate commerce, which property or facilities are required for the proper and convenient operation of *349 such utility or carrier, unless provision is made for the restoration, relocation, or duplication of such property or facilities elsewhere at the sole cost of the municipal corporation * *
In the chapter of the Code treating on “Appropriation of Property” by municipal corporations, the Legislature enacted Section 719.01, Revised Code, which reads in part:
“Any municipal corporation may appropriate, enter upon, and hold real estate * * *;
< Í * # #
“(0) For establishing airports, landing fields, or other navigation facilities, either within or without the limits of a municipal corporation for aircraft and transportation terminals, with power to impose restrictions on any part thereof * * *; all of which are hereby declared to be public purposes.
“Division (0) of this section [supra] does not authorize a municipal corporation to take or disturb property or facilities belonging to any public utility or to a common carrier engaged in interstate commerce, which property or facilities are required for the proper and convenient operation of such utility or carrier, unless provision is made for the restoration, relocation, or duplication of such property or facilities elsewhere, at the sole cost of the municipal corporation.”
Again, in Section 719.02, Revised Code, the Legislature has provided for the appropriation of property outside the municipal corporation limits for airport purposes.
Both under the Constitution and the statutes, the city of Cincinnati is empowered to build and operate an airport; and, although the powers of the city are derived directly from the Constitution, the statutes do not in any way restrict the constitutional grant of power but implement it, as it was the Legislature’s right to do.
In considering the city of Cincinnati’s claimed constitutional right to appropriate the village street involved in this case, we must appraise it against a background of constitutional purposes. The Constitution gives general authority to appropriate property, and undoubtedly it contemplates the condemnation of reql property which, historically, has been the subject of appropriation. It appears certain that the framers of the Constitution were not thinking in terms of the appropriation of *350 a city hall or of an established public cemetery or of the creation of an airport with two-to-three-mile runways. A constitution cannot be made to mean different things at different times. Although the policy of one age may ill suit the policy of another, the Constitution must not be subject to such fluctuations. If it becomes undesirable in a present age, it should be amended.
Contrary to the claim of the city of Cincinnati, the village of Blue Ash asserts a right to keep its street as it now exists free from appropriation by a neighbor municipal corporation, on the basis of a right which falls squarely within the frame of the Ohio Constitution.
Section 3, Article XVIII, Constitution of Ohio, reads as f ollqws:
“Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.”
Additional language in the Ohio Constitution classifies cities and villages as municipal corporations (Section 1, Article XVIII), and the Constitution provides further that “general laws shall be passed to provide for the incorporation and government of cities and villages” (Section 2, Article XVIII).
One of the general laws passed under authority of the Constitution is Section 723.01, Revised Code, which reads:
“Municipal corporations shall have special power to regulate the use of the streets. The legislative authority of such municipal corporation shall have the care, supervision, and control of public highways, streets, avenues, alleys, sidewalks * * * and shall cause them to be kept open, in repair, and free from nuisance.”
The streets and highways as to which the Constitution and statutes have given municipalities the power to “regulate” and “control” are not “public utilities,” as that term is used under Ohio laws; they are “public and governmental institutions, maintained for the free use of all citizens of the state,” the maintenance of which engages the municipality in the performance of a governmental function as distinguished from a proprietary function. City of Wooster v. Arbenz, 116 Ohio St., 281; Standard Fire Ins. Co. v. City of Fremont, 164 Ohio St., *351 344. It appears from the foregoing that the question, reduced to its simplest terms, may be stated: Can a grant of authority to one municipal corporation, acting as a proprietor, to condemn property within or without Its corporate limits, for the purpose of establishing a public utility, be exercised by appropriating property of another municipal corporation which is used by the latter municipality in the performance of a governmental function?
It is a general rule, and one of long standing, that when a condemnor, to which the power of eminent domain is given by law, seeks to exercise its power with respect to property already devoted to public use, its action may be enjoined if the proposed use will either destroy the existing use or interfere with it to such an extent as is tantamount to destruction, unless the law has authorized the acquisition either expressely or by necessary implication. The manner in which the property was originally acquired has no bearing upon the operation of the general rule. See 11 McQuillin, Municipal Corporations (3 Ed.), 398, Section 32.67; 1 Nichols on Eminent Domain (3 Ed.), 154, Section 2.2; 29 Corpus Juris Secundum, 861 et seq., Section 74.
It cannot be seriously contended that the Constitution has expressly authorized the taking of a street of one municipal corporation by another municipal corporation for public utility purposes of the latter. No express language gives one municipality, acting in its proprietary capacity, a right to appropriate and use land of another municipality which is already devoted to public use and which is in law a public and governmental instrumentality maintained for the free use of all citizens of the state, much less a right to appropriate and use such land for purposes inconsistent with its established use as a governmental instrumentality.
It requires no argument to prove that the use of the property for airport runway purposes is inconsistent with the use of the property for street purposes. Indeed, its use for airport purposes would entirely destroy its use for street purposes. This is not a case of a public utility crossing a highway under circumstances where the same land may possibly be used for the purposes of the public utility as well as for highway purposes.
*352 Determining as we do that the Constitution does not expressly confer a right to appropriate a dedicated street for airport purposes, can it be said that it does so by necessary implication?
Implication must arise only from the language used; and a taking by implication ‘ ‘ can be only to the extent of the necessity, and that necessity must arise from the nature of things over which the corporation desiring to take has no control, and not from a necessity created by such corporation for its convenience or economy.” McQuillin, Municipal Corporations (3 Ed.), 402, Section 32.67.
This case,must be controlled by legal principles and not by considering the practical effect of an airport for the city of Cincinnati at the expense of 'a public street in the village of Blue Ash. Each are municipal corporations, and if property of one, devoted to governmental uses, can be taken by the other for an airport, while acting in its proprietary capacity, it would make possible the destruction of a municipal corporation, or at least a part thereof, by another municipal corporation for its convenience and economy. Such power cannot be found by implication in the Constitution. In fact, a reading of Section 4 of Article XVIII of the Ohio Constitution, in the light of the proceedings of the Constitutional Convention of 1912 which submitted that section to the voters of Ohio for approval, appears to indicate that the section was primarily intended to confer the power of eminent domain on municipalities for the purpose of acquiring existing public utilities. Proceedings and Debates of Constitutional Convention of 1912, 1444. Certainly, power of eminent domain, given to a municipal corporation under Section 4, Article XVIII of the Constitution, was not intended to be repugnant to the power of home rule given to another municipal corporation under Section 3, Article XVIII of the Constitution.
The exact question under consideration has not heretofore been considered by this court. However, questions involving the proposed taking of property devoted to public use have frequently arisen under various factual situations. In Board of Education of City of Akron v. Proprietors of Akron Rural Cemetery, 110 Ohio St., 430, paragraph two of the syllabus reads:
*353 “Property already appropriated in the proper exercise of the power of eminent domain, cannot be taken for another use which will wholly defeat or supersede the former use unless power to make such second appropriation be expressly granted, (jRailroad v. Belle Centre, 48 Ohio St., 273, 27 N. E., 464, approved and followed.) ”
Other decisions of this court have followed the general rule extant in this country, that property already devoted to public use cannot be taken for another public use, at least if such use is an inconsistent one, without authority expressly given or necessarily implied.
It has been urged by the city of Cincinnati that under the circumstances of this case “the paramount public need for the property * * * must be determined by the court and the property can, as a matter of law, be acquired by Cincinnati if the paramount public need for the property * * # is for airport purposes rather than street purposes. ’ ’
The power of eminent domain is an incident of sovereignty, but the courts possess full authority to determine its proper limits and to prevent abuses in this exercise. Giesy v. Cincinnati, Wilmington & Zanesville Rd. Co., 4 Ohio St., 309. The limits to which the court’s power may extend are not governed by principles of equity, thereby giving power to a court to base its judgment upon a paramount public need in a contest between two sovereign governments, each possessing the power of eminent domain. The limit of the court’s power is to enjoin an unlawful or improper exercise of the power of eminent domain beyond the limits of a constitutional or statutory grant of such power. Injunction, in this class of cases, is a matter of strict right, not of equitable discretion.
The judgment of the Court of Appeals is reversed, and the judgment of the Court of Common Pleas granting the injunction is affirmed.

Judgment reversed.

Zimmerman, Taut, Matthias and O’Neill, JJ., concur.
Weygandt, C. J., and Bell, J., dissent.
Doyle, J., of the Ninth Appellate District, sitting by designation in the place and stead of Herbert, J.