CITY OF CLEVELAND, APPELLANT, *v.* PERK, APPELLEE.

162

*Mr. Clarence L. James, Jr.,* director of law, and *Mr. Paul Mancino, Jr.,* for appellant.

*Mr. John T. Corrigan,* prosecuting attorney, and *Mr. Thomas P. Cyrus,* for appellee.

SCHNEIDER, J. The city of Cleveland applied to the Board of Tax Appeals to have exempted from taxation certain designated areas in the terminal building of the Hopkins International Airport used for a lounge bar, drugstore, newsstand, barbershop, gift shop, and insurance counters, and designated areas in both the terminal and the adjacent grounds used for car rentals and a parking lot.[1] The board denied exemption.

Cleveland owns the property in fee. The areas in question are occupied and operated by private entities by virtue of leases from Cleveland for periods of time ranging from three to fifteen years, except for the parking lot, which term is for one year. For the rights obtained through the leases, the operators each pay to the city a percentage of gross revenue subject to a minimum annual guarantee.

Although Cleveland urges that the record does not support the conclusion of the Board of Tax Appeals that the lessees operate the facilities as businesses for private profit, we cannot find that conclusion to be unreasonable. It is difficult to understand what, other than profit, motivates the lessees to bid for the opportunity to pay as high as 81.1 percent of the gross revenues, as in the case of the parking lot. And, if it is a fact that Hertz, Avis and the Apcoa Division of ITT Consumers Services Corp. (the parking lot operation), for example, are eleemosynary institutions which devote all of their income, after expenses,

---

[1] In a stipulation before the Board of Tax Appeals, a game room and a bank are mentioned as included in the application for exemption. However, no lease for either operation is contained in the record.

to public use, the burden to show that fact would appear to rest upon the party seeking exemption.

The record, on the other hand, is replete with evidence that the facilities and operations here involved, insofar as they accommodate and serve the convenience of the air traveler, are incidental and necessary to the successful function of the airport. This conclusion may be admitted, as well as Cleveland's contentions that (1) the airport is a public utility; (2) all property thereof is devoted to a public use and purpose; and (3) the revenue incidentally derived by the city therefrom does not, in and of itself, alter the public character of the use. Paragraphs 2, 4, 5 and 6 of the syllabus of *Toledo* v. *Jenkins* (1944), 143 Ohio St. 141 (Toledo owned and operated airport—exempt). But, see *Cleveland* v. *Perk* (1965), 2 Ohio St. 2d 173, and *Carney* v. *Cleveland* (1962), 173 Ohio St. 56 (aircraft hangars at Cleveland airport leased to private entities—taxable).

Moreover, a public purpose of a proprietary nature is still a public purpose within the meaning of R. C. 5709.08.[2] Paragraphs 2 and 3 of the syllabus of *Columbus* v. *Delaware* (1956), 164 Ohio St. 605 (Columbus owned and operated water reservoir—exempt), and paragraph 2 of the syllabus of *Graf* v. *Warren* (1967), 10 Ohio St. 2d 32 (state owned and operated parking facility—exempt).

However, the complete statutory requirement, as ordained by R. C. 5709.08 for tax exemption in this case, is "public property used *exclusively* for a public purpose." (Emphasis supplied.) And, we cannot fail to consider that paragraph 4 of the syllabus in *Cleveland* v. *Board* (1950), 153 Ohio St. 97 (Cleveland owned stadium—taxable), declaring that the requirement "does not mean used merely for a public benefit, and a showing that some public pur-

[2]Cleveland's reliance upon R. C. 5709.10, apart from R. C. 5709.08, in order to sustain its claim for exemption, is misplaced. The former statute grants exemption to designated types of public facilities but contains the almost identical phrase, "used exclusively for public purposes." Consequently, our decision will be confined to the application of that test to the facts.

pose may be served by the use of the premises is not sufficient to constitute an exclusive public use,'' is yet a viable rule, notwithstanding paragraph 2 of the syllabus of that case was overruled by paragraph 3 of the syllabus of *Denison* v. *Board* (1965), 2 Ohio St. 2d 17 (private college president's residence—exempt); paragraphs 5 and 6 of the syllabus of that case were questioned and distinguished, at page 612, in *Columbus* v. *Delaware* (Columbus owned and operated water reservoir—exempt); and paragraph 5 was questioned and distinguished as *dictum* in paragraph 2 of the syllabus of *Graf* v. *Warren* (state owned and operated parking facility—exempt).

It is not only interesting, but pertinent, to note that the late Chief Justice Taft (joined by the late Judge Stewart) was the one vigorous dissenter in *Cleveland* v. *Board* (Cleveland owned stadium—taxable), and the author of the majority opinion in *Columbus* v. *Delaware* (Columbus owned and operated water reservoir—exempt), and, for a restructured court, the opinions in *Denison* v. *Board* (private college president's residence—exempt) and *Graf* v. *Warren* (state owned and operated parking facility—exempt). In fact, the majority opinion in *Denison* is a condensed version of the dissenting opinion in *Cleveland* v. *Board*. Compare, for example, 2 Ohio St. 2d, page 27, with 153 Ohio St., pages 117 and 118. But Judge Taft's goal was, rather than a more liberal tax exemption policy, an interpretation of the 1929 amendment to Section 2 of Article XII of the Ohio Constitution in favor of the plenary power of the General Assembly to determine exemptions from real property, as well as personal property, taxes, which he finally achieved in *Denison*, and the rule that a proprietary function of government is nevertheless a public function, which he achieved in *Columbus* v. *Delaware*.

Indeed, as Judge Taft pointed out in the latter case (164 Ohio St., at page 612), he had stated in his dissent in *Cleveland* v. *Board* (153 Ohio St., at page 126): ''If an 'exclusive' use for public purposes were necessary for tax exemption, I would be inclined to agree that the stadium

was not exempted." Of course, the antecedent of R. C. 5709.08 (G. C. 5351) did not, in 1950, contain the word "exclusively," which was inserted by amendment, effective September 7, 1951 (124 Ohio Laws, 379). Thus, this court would not be required "to render a different decision from that rendered in *Cleveland* v. *Board* [Cleveland owned stadium—taxable] . . . if the problem considered in that case were now presented to us for decision again." (164 Ohio St., at page 613.) The same statement is equally applicable after the announcement of *Denison*.

Thoroughly consistent, Judge Taft refused to concur in the syllabus of *Carney* v. *Turnpike* (1958), 167 Ohio St. 273 (turnpike plazas leased to private entities for restaurant and gas station purposes—exempt), because he realized the tenuous ground upon which the decision rested since the rule of *Denison* had not yet been adopted. As he said in his concurring opinion, at page 277, again joined by Judge Stewart: "It is difficult to understand how such operations can be considered as exclusive uses of the property involved for public purposes or even as public utility operations." In other words, although based upon error when it was decided, that case has been cured by the pronouncement in *Denison*. It is now immaterial that there is no exclusive public purpose in the use of the turnpike plazas or that they cannot be identified wholly as public property for the reason that the General Assembly has specifically designated all turnpike commisssion property as exempt from taxes under its constitutional power which was finally recognized in *Denison*.

Our conclusion is that the mere showing that the needs of the airport require accommodation of the personal needs of its users is not sufficient to constitute an exclusive public use of those portions of the airport under consideration here. Admittedly, a benefit is bestowed upon even the general, in addition to the air traveling, public by having the services available at the airport. Moreover, serving the public is the aim and object of enterprise, be it public or private.

When, however, private enterprise is given the opportunity to occupy public property in part and make a profit, even though in so doing it serves not only the public, but the public interest and a public purpose, such part of the property loses its identity as public property and its use cannot be said to be exclusively for a public purpose. A private, in addition to a public, purpose is then subserved. *Cleveland* v. *Perk* and *Carney* v. *Cleveland* (aircraft hangars at Cleveland airport leased to private entities—taxable), and *Troy* v. *Board* (1954), 160 Ohio St. 451 (Troy owned sports arena leased to private entities—taxable). See, also, *Division* v. *Board* (1948), 149 Ohio St. 33 (state owned land rented to private citizen—taxable), and *Cincinnati College* v. *State* (1850), 19 Ohio St. 110 (private college building rented to private citizen—taxable). Distinguish *Graf* v. *Warren* (state owned and operated parking facility—exempt); *Cleveland* v. *Carney* (1961), 172 Ohio St. 189 (Cleveland owned and operated public auditorium—exempt; private leases of "short duration" and the private lessees vary); *Columbus* v. *Delaware* (Columbus owned and operated water reservoir—exempt); *Muskingum* v. *Walton* (1970), 21 Ohio St. 2d 240 (conservancy district owned and operated "concessions"—exempt); *Bowers* v. *Akron* (1968), 16 Ohio St. 2d 94 (Akron owned and operated parking facility for Akron owned and operated hospital—exempt); and *Cleveland* v. *Board* (1958), 167 Ohio St. 263 (Cleveland owned and operated rapid transit system—exempt).

We cannot conclude this discussion without comment on *Toledo* v. *Jenkins* (Toledo owned and operated airport—exempt), upon which Cleveland places great stress. As already noted, the propositions of law contained in paragraphs 2, 4, 5 and 6 of the syllabus of that case do not assist Cleveland on the ultimate question here. None even hold that the entire airport was "public property used exclusively for a public purpose." In light of *Denison*, paragraph 3 of the syllabus was incorrect when announced, but because of the 1950 amendment to G. C. 5351 (now R. C.

5709.08), it is now free from error. However, that paragraph merely restates the requirement for taxation. Paragraphs 1, 8 and 9 of the syllabus are not involved in the instant case.

Thus, paragraph 7 of the syllabus remains for consideration. It illustrates and underlines the differences between that case and the instant one. There, the court was presented with the question of the taxable status of the entire airport owned and operated by Toledo. Although it was noted that certain areas of the terminal were used as ticket offices, storage space and dining rooms, uses which might lend themselves to a situation not unlike those presented in this case, and that two airlines rented office space somewhere in the terminal, the court was not presented with the taxable status of such areas standing alone, as we are here. Indeed, it could not have been, for the reason that the so-called "split-listing statute" (R. C. 5713.04) had not then been adopted. See *New Haven Church* v. *Board* (1967), 9 Ohio St. 2d 53. It is by authority of that statute alone that the county auditor in this case was able to place the areas in question on the tax duplicate apart from the balance of the airport facility.

Thus, cognizant of the difficulty which certain areas of the terminal building and hangars presented, the court qualified paragraph 4 of the syllabus in *Toledo* v. *Jenkins* by saying, "*In general* the real property of a municipal corporation, constituting part of its wholly owned and operated public airport, is public property within the meaning of the Constitution and statute." (Emphasis supplied.)

Still, the question remained, was it used *exclusively* for public purposes?

The decision held it to be and apparently the purpose of paragraph 7 of the syllabus was meant to answer that question and serve as the basis for granting exemption, except for one building owned by a private party but situated on municipal land leased to him. Yet, paragraph 7 is unintelligible unless read in conjunction with the opinion, at page 152. After asking the question, "What is the meaning

of the word 'exclusively?,' " the opinion never answers it. But, the next sentence reads: "It is not essential to exemption that all the property that is part of the utility unit be used for public purposes." No further elaboration of the meaning of "exclusively" is made in the balance of the opinion.

Obviously, the court was presented with a difficult choice: Should the exemption for the unit as a whole fail because particular parts of the unit would not fit what was then thought to be the constitutional requirement for exemption, or should the use of those particular parts be rationalized as incidental and necessary to the whole so that exemption would not fail. The present court may well have made the same choice under the same circumstances. In any event, we are not faced with that problem today.

Being neither unreasonable nor unlawful, the decision of the Board of Tax Appeals is affirmed.[3]

*Decision affirmed.*

O'NEILL, C. J., HERBERT, CORRIGAN, STERN and LEACH, JJ., concur.

BROWN, J., not participating.

---

[3]Most of the leases involved provide that any tax liability is to be paid by the lessee. In those instances, the lessee has the right to contest the amount or validity of taxes, by legal proceedings in its own name.

The obvious purpose of the grant of tax exemption to governmental bodies is to confer a benefit upon them. In these instances, exemption would not inure to the benefit of Cleveland since tax liability has been assumed by the lessee. Therefore, we question whether Cleveland can now assert on its own behalf an application for exemption as to these particular leases. However, in view of the fact that the barbershop and parking lot leases do not contain an assumption of tax liability by the lessees, we rest our decision as to all of the areas on the basis stated.