**INDEPENDENT TAXICAB ASSOCIATION OF COLUMBUS, Appellant,**

v.

**COLUMBUS GREEN CABS, INC. et al., Appellees.**

[Cite as *Independent Taxicab Assn. of Columbus v. Columbus Green Cabs, Inc.* (1992), 84 Ohio App.3d 361.]

Court of Appeals of Ohio,
Franklin County.

No. 91AP–1469.

Decided Dec. 17, 1992.

362

*McNamara & McNamara* and *James D. McNamara,* for appellant.

*Butler, Cincione, DiCuccio & Dritz, Alphonse P. Cincione* and *David B. Barnhart,* for appellee Columbus Green Cabs, Inc.

*Ronald J. O'Brien,* City Attorney, and *Daniel W. Drake,* for appellee city of Columbus.

---

BOWMAN, Judge.

Appellant, Independent Taxicab Association of Columbus, Inc. ("ITAC"), has appealed from a judgment of the Franklin County Court of Common Pleas, which granted the motions for summary judgment of appellees, Columbus Green Cabs ("Green Cabs") and the city of Columbus,[1] and dismissed appellant's complaint for declaratory judgment. Appellant had sought a finding that a contract between the city and Green Cabs was null and void and had sought temporary and permanent injunctions to prevent the city of Columbus from entering into any contract for taxicab services at Port Columbus International Airport. Appellant sets forth the following assignments of error:

"First Assignment of Error

"The trial court erred to the prejudice of the appellant by granting summary judgment herein, because genuine issues of material fact did exist which precluded summary judgment.

"Second Assignment of Error

"The trial court erred to the prejudice of the appellant, as a matter of law, by holding that the existence of a factual dispute is 'irrelevant' to the issue of 'due process.'"

Appellant's assignments of error are related and will be addressed together.

The system for providing taxicab service at the airport is relatively simple. A cab driver looking for passengers at the airport waits in an area near the north end of the terminal. As cabs are needed, the taxicab starter sounds a buzzer in the waiting area and several cabs drive to the "ready line," a traffic lane set aside for cabs, on the arriving flights level. At the arriving flights level, taxicab drivers deposit a $2 surcharge into a coin machine and pull out a ticket, a gate rises, giving access to the arriving flight level, and the cab pulls forward to pick up the passenger. $1 of the $2 surcharge is charged to the passenger and recovered by the driver.

At sometime prior to the mid–1980s, Yellow Cab Company apparently had a contract to provide exclusive taxi service at the airport. When the city commenced issuing additional taxicab licenses and issued licenses to independent taxi

---

1. The Columbus Airport Authority was later named as a defendant.

drivers or independent taxi companies, Yellow Cab ceased to do much business at the airport. In the mid–1980s, in an effort to bring some order to the taxicab operation, the city, for a time, entered into a contract with a temporary employment agency and eventually hired its own taxicab starters supervised by Tony Iacoboni, parking facilities manager for the airport. Under Iacoboni's supervision and direction, rules and regulations for taxis were promulgated and an inspection system was devised whereby cabs serving the airport had to display a decal showing the vehicle had passed city inspection. An effort was also made to improve the personal appearance of some of the drivers.

Sometime in the later 1980's, but prior to the time Larry Hedrick was hired as airport manager in July 1987, the city determined to contract for private management of the taxicab service. Hedrick concurred with the decision to privately contract for taxicab starter services for the reasons that such a contract would be a source of revenue for the airport, would reduce costs to the airport and would improve the quality of cab service.

The city advertised for proposals and received several, including submissions by Green Cabs and ITAC. Among the items requested in the request for proposals was a bid for a ratio between the contractors' cabs and other cabs. Such a ratio was to represent the relationship between the total number of cabs called by the starter and the number of those cabs which would belong to the contractor. Green Cabs supplied such a ratio, ITAC did not. Although the proposals from Green Cabs and ITAC were similar, with ITAC offering a larger guarantee to the city, the city determined to accept the proposal from Green Cabs. Iacoboni testified in his deposition that Green Cabs was selected because it had more years of experience in the taxicab business and it had a computer program to monitor vehicle maintenance. In contrast, Iacoboni stated that, at the time the proposal was received, ITAC was a relatively new organization and appeared to have some internal organizational and management problems and that, because of its structure, ITAC had no assets.

In April 1990, Columbus City Council passed Ordinance No. 996–90 to authorize the director of Public Utilities and Aviation to enter into a contract with Columbus Green Cabs to provide for management and coordination of taxicab services at the airport. The ordinance provides:

"WHEREAS, the City has a substantial need to reduce the costs incident to the provision of taxicab service from the Airport and to provide for the efficient management and coordination of such service; and

"WHEREAS, it is in the interest of such sound public policy considerations and to the economic benefit of the City to contract for the exclusive private management and coordination of taxicab service from the Airport[.] * * *

"* * *

"Section 1. That it is hereby deemed to be in the best interest of the City and the traveling public for the purpose of promoting the effective management and coordination of taxicab service from Port Columbus International Airport, and for the economic necessity of the defraying or substantially eliminating the costs incurred by the City therefor, to contract for the exclusive management and coordination of taxicab service from the Airport."

The contract is not part of the record[2] but, apparently, the parties do not dispute its general terms and conditions. Green Cabs provides taxicab starter service and is granted a ratio of one out of every four cabs, that is, out of every four cabs called by the taxicab starter, one must be a cab of Green Cabs or of a Green-Cabs-affiliated company. Green Cabs collects the two dollar surcharge paid by all cabs entering the airport "ready line" and guarantees payment to the city of $90,000 per year or five cents per enplaned passenger, whichever is greater. Any taxicab company may drop off passengers at the airport or a passenger may call in advance to request a specific cab or request a specific cab from the starter; however, any cab wishing to otherwise pick up passengers at the airport must subcontract with Green Cabs and display a decal apparently indicating some relationship with Green Cabs. The terms and conditions of the subcontract are not part of the record.

Sometime after the contract was signed, ITAC filed suit for preliminary and permanent injunctions, seeking to have the contract declared null and void and to prohibit the city from entering into any similar contract. The trial court overruled the motion for a temporary restraining order and granted appellees' motion for summary judgment.

On appeal, appellant contends the ordinance and contract authorized by the ordinance are a police regulation and that genuine issues of fact exist as to whether the contract bears any reasonable relationship to the health, safety and welfare of the community. Appellant further argues that the contract involved expenditures of public funds and the city was required to advertise for bids in accordance with the provisions of Columbus City Code Chapter 329. Last, appellant contends the ratio in the contract deprived appellant of a property right without due process of law.

In support of their motions for summary judgment, appellees filed the depositions of Tony Iacoboni and Larry Hedrick, as well as a copy of the letter sent to request submission of a proposal. In response, ITAC attached a copy of a complaint and settlement agreement in an antitrust case which prohibited Green

---

2. While a copy of the contract is attached to appellees' brief, it was not filed with the trial court and is not part of the record. App.R. 9(A).

Cabs, among others, from entering into an exclusive taxicab service contract at the airport and affidavits of several independent taxicab drivers stating that there were no problems with taxi service at the airport prior to the contract and that the contract has caused them to suffer economic loss.[3]

■ Summary judgment is proper if there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. It is a procedural device designed to terminate litigation at an early stage where a resolution of factual disputes is unnecessary. The burden of showing that no genuine issue exists as to any material fact falls upon the moving party in requesting summary judgment. However, a motion for summary judgment forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095.

■ Appellant contends that an issue of fact existed as to whether a problem with taxi service existed at the airport and whether there was a need or basis for the contract with Green Cabs. Hedrick and Iacoboni both testified in their depositions that the city had received general complaints about taxi service, primarily about the independent taxi drivers and their cabs. The complaints concerned issues such as the appearance of the drivers and the manner in which they conducted business, as well as the mechanical condition of the cabs. Iacoboni further testified that, while there were problems, many were corrected when the city took over the starter service. The affidavits submitted by appellant in opposition to the motions for summary judgment state there were no problems. Appellant further argues that the contract was merely a subterfuge to give Green Cabs the major portion of the taxicab business at the airport.

Section 4, Article XVIII, Ohio Constitution provides:

"Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service. The acquisition of any such public utility may be by condemnation or otherwise, and a municipality may acquire thereby the use of, or full title to, the property and franchise of any company or person supplying to the municipality or its inhabitants the service or product of any such utility. [Adopted September 3, 1912.]"

Section 7, Article XVIII, Ohio Constitution provides:

---

**3.** Although appellant, in its brief, relies on statements made in the deposition of Kenneth Kaufman, president of Green Cabs, the deposition was not filed with the trial court and is not part of the record. App.R. 9(A).

"Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government. [Adopted September 3, 1912.]"

 An airport is a public utility, *Toledo v. Jenkins* (1944), 143 Ohio St. 141, 28 O.O. 72, 54 N.E.2d 656, and the city's direct constitutional grant of authority to operate a public utility, such as an airport, carries with it the necessary authority to make all contracts required to accomplish that goal. *State ex rel. Sweeney v. Michell* (1933), 46 Ohio App. 59, 15 Ohio Law Abs. 25, 187 N.E. 739, affirmed (1934), 128 Ohio St. 266, 191 N.E. 98. The contract in question is not a police regulation. A police regulation is enacted for the preservation of the health, safety and morals of the community as a whole, *Cleveland Tel. Co. v. Cleveland* (1918), 98 Ohio St. 358, 121 N.E. 701, and is an ordinance establishing a standard to which the community is expected to adhere. Rather, the contract in this matter is an exercise of the city's right to license or permit Green Cabs to conduct a business on airport property in much the same manner as the city enters into agreements with restaurants, newsstands, car rental agencies or other services generally associated with a modern airport. In the absence of the city's acquiescence, no one has a right to conduct business at the airport. If there is a right to conduct business and the city seeks to regulate that right, the regulation is a police regulation. If there is no such right to conduct a business but the city grants such a right, it is a license or franchise.

Whether or not an issue of fact existed as to problems with the independent taxicab drivers, the city, pursuant to its authority granted by Sections 4 and 7, Article XVIII, Ohio Constitution, had the authority to enter into a contract with Green Cabs for taxicab starter service. The contract was proper even if the city admitted there was no problem with the existing taxi service at the airport.

 In his deposition, Hedrick also testified that, in addition to there being some complaints about the independent taxicabs, the economics of the cab business were the primary reason for the contract. Columbus City Council specifically found that the city benefitted economically from contracting for management services, both in saving costs on personnel and equipment, and in generating revenue. The wisdom of such legislation is for council to determine and appellant presented no evidence which would raise an issue of fact whether the economic considerations supporting the contract were clearly erroneous.

Columbus City Code Chapter 329 provides:

"329.01 Purpose.

"The purpose of this chapter is to establish a purchasing and procurement system of quality and integrity that will maximize the purchasing value of public

funds and provide fair and equitable treatment to all persons involved in public purchasing. [Ord. 1426–88.]

"329.02 Application.

"This chapter applies to any purchase of materials, supplies, equipment, construction, service and/or professional service by a City agency and the sale of any City property, whether real or personal. It shall apply to every expenditure of public funds by a City agency for purchasing irrespective of the source of the funds. * * * "

Professional services are defined in Columbus City Code 329.04(k) as:

" * * * A service which usually requires advanced training and/or a significant degree of expertise to perform, and which often require official certification or authorization by the State as a condition precedent to the rendering of such service. By way of example and without limiting the generality thereof, professional services include the personal services rendered by architects, attorneys at law, certified public accountants, financial consultants, city and regional planners, management consultants, and professional engineers."

Clearly, management of the taxicab operation at the airport is not a professional service. Further, pursuant to such terms of the contract as are discussed in the briefs and not disputed by the parties, the city is not purchasing services from Green Cabs and was not required to comply with the competitive bidding procedures set forth in Columbus City Code Chapter 329. While efficiently managed taxi service is a convenience and benefit to the travelling public, no direct service is provided to the city itself. The city could operate the airport without taxicab starter services and without taxicabs. Green Cabs was granted a license or a permission by the city of Columbus to do business at the airport, for which it pays the city $90,000 a year or five cents per enplaned passenger, whichever is greater. In return, Green Cabs gets twenty-five percent of the cab business at the airport and the remaining cab companies get the balance or seventy-five percent of the business at the airport. The contract between the city and Green Cabs, to the extent it is set forth in the briefs, is no different than licenses or franchises granted to restaurants, newsstands, car rental agencies or other businesses associated with an airport facility. Hence, because the city was not purchasing services but granting a license or a franchise to do business, it was not required to comply with Columbus City Code Chapter 329.

Appellant also contends that the contract in question deprived appellant of a property right without due process of law; that is, prior to the contract with Green Cabs, appellant had essentially all of the airport business because Green Cabs chose, for whatever reason, not to serve the airport. Pursuant to the contract with the city, one of every four cabs called by the taxicab starter must

be affiliated with Green Cabs. Hedrick testified in his deposition that a ratio was deemed necessary to avoid the possibility that whoever received the taxicab management contract would attempt to exclude all other cab companies, as well as to provide additional revenue to the company which received the contract as an incentive to submit a proposal. Contrary to what appellant argues, there is no evidence the ratio was designed solely for the benefit of Green Cabs but, rather, the use of a ratio would benefit whichever cab company was awarded the contract. As noted above, ITAC submitted a request for a proposal with the opportunity to suggest a ratio but failed to do so. The fact that Green Cabs did not provide many services to the airport prior to the inception of this contract is irrelevant, as there was nothing to prevent Green Cabs from doing so, nor was there any right guaranteeing independent taxicab drivers a certain amount of the airport business.

For the foregoing reasons, appellant's assignments of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

DESHLER, J., concurs.

TYACK, J., concurs in part and dissents in part.

TYACK, Judge, concurring in part and dissenting in part.

For a variety of reasons, I cannot join in the majority opinion.

The factual history behind this case indicates that, for many years, a set of taxicab companies with a common owner have dominated the Columbus market for taxicab services. This led to litigation in federal court which resulted in a consent decree intended to encourage competition. Following the litigation, independent taxicab drivers were better able to compete with Green Cabs, Yellow Cabs and other affiliated companies which have traditionally dominated the local market.

Construing the evidence most favorably to ITAC, as the trial court was compelled to do, the owner of the affiliated cab companies began complaining to influential friends about the taxicab service at the airport. The affiliated companies, robbed of their competitive advantage, had lost much of their airport business and/or had decreased their business at the airport because they had to wait in line for their opportunity to pick up customers. Rather than have their drivers sitting idle while waiting, the affiliated companies encouraged the drivers to perform services at locations other than the airport.

Again construing the evidence in favor of ITAC, the owner of the affiliated cab companies generated enough discussion in the business community that the

Columbus Airport Authority began to investigate ways to change the way taxicab service was provided at the airport. A request for proposal was circulated which seemed tailored to assist the group of cab companies which had dominated the service to the airport before the federal court action. Specifically, the request included a requirement that the proposal to be submitted include a ratio of cabs to be provided by the entity which got the contract to the total number of cabs picking up fares. This ratio was anathema to ITAC and in effect prevented ITAC from submitting a proposal which complied with the request for proposal.

The effect of the proposal and the resulting contract was to place one cab company in a position to inspect all the cabs which service the airport and reject cabs which for some reason were deemed unsatisfactory. The contract allowed one cab company to be guaranteed one fourth of the cab business at the airport, without having its cabs wait in line for a chance to pick up a fare. The contract also required that a $2 per cab surcharge ($1 of which was formerly collected directly by the city of Columbus and/or the Columbus Airport Authority) be paid to the one cab company. The individual cab drivers could not be reimbursed more than one of the $2, so the other cabs which served the airport would be directly subsidizing their competitor.

To the surprise of no one, one of the cab companies owned by the individual who started the griping about the cab service at the airport got the contract.

ITAC sued to stop the contract but was refused a restraining order. Eventually, summary judgment was granted to Columbus Green Cabs, Inc. (which was awarded the contract), the city of Columbus, and the Columbus Airport Authority. ITAC then appealed to us and assigned the two errors set forth above.

The second assignment of error centers around a due process of law argument, apparently meant to be part of a theory of liability pursuant to Section 1983, Title 42, U.S.Code. Although having an important decision made about one's livelihood by a city council may not seem like much due process to ITAC, determination by city council is frequently all the process that is due where a decision is being made about whether a contract should be entered into by a city.

The evidence before the trial court, construed most favorably to ITAC, indicated that the process used to decide who to recommend to city council to receive the contract was heavily weighted in favor of the ultimate recipient. However, the fact that the process which generated the recommendation was less than fair does not automatically mean that the resulting ordinance was arbitrary and capricious. The record does not support a finding that city council was aware of the machinations which ITAC alleged were occurring behind the scenes. Thus, the record does not contain the factual requisites for a claim pursuant to Section 1983, Title 42, U.S.Code, as alleged in ITAC's complaint.

The harder issue, and the one upon which I reach a different result than the other two members of this judicial panel, is the issue of whether summary judgment was appropriate as to the remaining theories before the trial court. I do not believe that the appellees demonstrated that no genuine issue of material fact was present and that they were entitled to judgment as a matter of law.

One of the primary theories presented by ITAC both before the trial court and in the briefs in this appeal is that the surcharge formerly collected by the city, and now collected at a higher rate by Green Cabs pursuant to the contract, constituted public funds. Public funds can be expended for the purchase of professional services only after compliance with Columbus City Code Section ("C.C.") 329.12.

The city and the Columbus Airport Authority made no attempt to comply with C.C. 329.12. Instead, the city and the Columbus Airport Authority argued that the surcharge, which is set by city ordinance and which apparently generates $160,000 more money in collections than the $90,000 sum that the city is paid by Green Cabs, does not involve an expenditure of public funds. The city and the Columbus Airport Authority submit (and the trial court found) that the contract is really a contract to generate revenues for the city, not an expenditure of public funds. Under this theory, if a company pays the city $1 and in return is permitted to collect $1 million from individuals or business entities in Columbus, backed by the power of city government, $1 million would not be an expenditure of public funds but would be a revenue contract. The fact that the city in actuality loses $999,999 in the process really is not important in making the determination, at least under this argument.

I believe that the sums collected via the surcharge, having been set by a city ordinance, having been formerly collected by the city and being collected now at a public airport for the right to provide taxicab service to the general public, are in fact public funds. Thus, I believe that the record below shows the contract to have been awarded illegally and that summary judgment for the appellees was inappropriate.

The discussion in the opinion from which I dissent talks at some length about the rights of a home-rule city when maintaining a public utility. That discussion does not address nor does the Ohio Constitution sanction a city ignoring its own duly enacted ordinances on the subject of the expenditure of public funds.

Because I believe the trial court erred in granting judgment in favor of the appellees, I would sustain the first assignment of error, reverse the judgment of the trial court, and remand the cause for further proceedings. Since the majority opinion does not do so, I respectfully dissent as to that part of the majority opinion.